When you're ready. Thank you, Your Honor. Thomas Price for Jesus O. Cordova. This particular case has a lot of facts, and I won't necessarily belabor them, assuming that the Court has gone ahead and read the briefs. One thing that I would like to point out related to the Batson challenge is that we did not have a ruling by the judge on that. And he did recite on page 393 of the transcript, of the excerpt of the record, that he did not believe there was any way to correct it at this time. If it needs correcting, he was not predetermining a decision on it. We'll try the case, and you can brief the facts. We had previously said that we had submitted all the facts that we had, and arguments that we had as to why this was a legitimate Batson challenge. Didn't the judge invite you to come back at a later phase and address the matter further? Yes, but previous to that we had said that we didn't have anything further to offer to the Court, so we did not end up having a ruling on it. Let me make sure I've got this straight. As I understand the record, the objection was made after the jury was seated, and after the veneer was dismissed, so that the U.S. attorney couldn't follow up on, oh, you know, I don't care that much. Listen, I'm happy to go back on it. The judge at that point says, listen, we'll deal with this later, a briefing, if I go. That sounds to me like it was half an invitation if you wished to pursue it. It sounds to me as though it was half maybe the judge forgot about it, but you did nothing to remind the judge, you know, you said you were going to rule on this. Is that right? That's correct. So everybody just kind of dropped it. That's right. And we're supposed to now rule on it. Well, it's a difficult position, but that's where the record was left, and I don't really have anything further to add on it in terms of that particular issue. Does that mean this is a plain error review? Yes. Okay. I think the more important issues are the later issues related to the case, and those are really the ones that I want to concentrate on. Essentially, we had raised the argument prior to trial that any of the statements of the informant, Robert Parks Coons, that he might be offering about what Mr. Cordova had said in jail were statements that should not be coming in in the government's case in chief. We lost that argument. The court said that those statements could come in. Our arguments essentially were that Robert Parks Coons was a commission agent. He was more than simply a jailhouse informant, and that because Mr. Cordova had invoked to Sergeant Davis that he didn't want to talk anymore, that that was sufficient for Agent Davis to not pursue any kind of statements from Mr. Cordova. In fact, Mr. Davis contacted Mr. Coons, who was in jail at the time, knowing that Mr. Cordova came to jail dope sick under the influence of methamphetamine. Robert Parks Coons ultimately not just simply keeps his ears open. He actively engages in speaking with Mr. Cordova, and in fact hatches with him, according to Coons, the second count of the indictment, which is the plan to tamper with witness. Did you make a Sixth Amendment messiah argument here? We did not, because this is the time before counsel was appointed. This is during a period that the Fifth Amendment would apply. We did not think that it was premature for a Sixth Amendment to attach. Essentially, what happens during the course of the trial, the way this comes in, is it comes in in a case of rebuttal by the government. The government did not, in fact, put any of those statements, alleged statements of Mr. Cordova to Coons in their case in chief. It came in in the course of a case in rebuttal. The defense put on a witness named Adriana Estrada, who testified as to a conversation she had with Jack Ivanoff, about Jack Ivanoff feeling bad about Mr. Cordova being accused for something Jack Ivanoff had done. The government contended that it was legitimate to bring up the conversations between Coons and Cordova as some legitimate rebuttal of that statement. We objected. We contended that that was not proper. It was not proper rebuttal because, essentially, what we're doing is we're rebutting something that's a matter of state of mind to Mr. Cordova when, in fact, the witness who had testified talked about Jack Ivanoff, things she had observed Jack Ivanoff do in terms of physically handling a gun, and, in fact, a statement that he had made. So our evidence had everything to do with Jack Ivanoff's state of mind and what Adriana Estrada had observed him do. It didn't have anything. So I think that bringing this evidence in in a case of rebuttal was improper, and it was improper because of two reasons. It was improper rebuttal, and because of the first reason, we contend that the court ruled incorrectly in terms of allowing the statements of Mr. Coons to come in, in the first place. So that's essentially our argument there. Our third point that I wanted to bring up is that we do contend that the government improperly vouched for Mr. Ivanoff. Mr. Ivanoff was a witness who was very contradictory in all of his statements. When he came up to the stand, he was constantly contradictory. And what are the words that you contend were the improper vouching? The improper vouching we contend that he told the jury, I think you'll find Ivanoff an honest man telling you the truth. He said that to the jury. It's different from saying, I think. I think. He doesn't say, I think he's an honest man. He says, I think you'll find that he's an honest man. I think you'll find. In other words, I think you're going to return a verdict of guilty. Is that improper vouching? I would not think that that's improper vouching, but in this particular case, we contend that it is improper vouching because the government had, previous to this, the government had evidence not only that Ivanoff was so contradictory, but that in order to get a case in rebuttal regarding Mr. Ivanoff, the government contended it needed to get Mr. Ivanoff back on the stand on the basis that Mr. Ivanoff was going to take the stand and say that he never spoke with Adriana Estrada. I understand that. You've got a witness here who can be believed or can not be believed, but what I'm interested in is the vouching, which is, of course, the argument. What the prosecutor said that would either state directly or strongly imply that the prosecutor personally thought that he was telling the truth. To say, I think you will find, is not that far away from the sort of fairly conventional thing of, I think when you thought about this case, you will return a verdict of guilty because you will believe the witnesses who said he did these things. That is correct, except for the facts leading up to it, which I think indicates that the statement is improper vouching. That's essentially the argument. Will you be addressing further the question of the rebuttal testimony of Mr. Koontz? Well, the other issue relates to whether or not the other argument that we raised, and hopefully it's not confusing, it may be. The argument is that the nature in which Mr. Koontz was used as a witness in rebuttal unfairly prejudiced the defendant in having a fair trial because of the joinder issue, because he was in a position where he was being tried on both the case of the felon in possession of a firearm and the witness tampering. Mr. Koontz had essentially been commissioned to contact this guy and had been offered some kind of benefit that he was expecting from the government in terms of his freedom. Mr. Koontz, in fact, when he contacted Mr. Cordova, he admits essentially in the record that he hatched a plan for witness tampering. To the extent that these cases are tried together, it makes it very difficult for Mr. Cordova to defend himself on either charge. In terms of, because in terms to defend yourself on the witness tampering charge, you really have to bring in, in detail, all those statements that we were contending that Koontz should not be allowed to bring up in the firearms charge, namely the conversation in the jail. The conversation between Koontz and Cordova, however, has tremendous relevance in terms of hatching the plan to engage in the witness tampering. And the question as to whether or not that behavior on the part of Koontz could have been used against the government in the witness tampering case. So your argument not only is that evidence from Mr. Koontz that there was witness tampering should have been excluded, but that somehow Mr. Koontz participated in or entrapped your client to do the witness tampering? When you say hatch the plan, I'm trying to figure out what you mean when you, because you repeated that phrase a couple of times. What do you mean when you, what's the legal significance I'm supposed to attach to your use of that phrase? If there was a severance, there could have been an argument raised as to whether or not that could be used as a, as potentially an argument for somehow that there was entrapment. It could have been used as their severance. However, when the cases are joined, it's, you have to fight against the, in the gun case, all those statements regarding hatching the plan are basically prejudicial to your defense in the gun case. However, all those statements might be useful in terms of, in terms of the entrapment argument in the, in the case of the witness tampering. I had thought that your main concern about joinder was that, that the introduction, that to have the witness tampering charge joined with the felon in possession charge meant that the jury would find out that the defendant had a prior conviction, which would not normally have come in if you had a separate witness tampering charge. Yes, that's the argument that's in the brief, yes. Was that not the, is that not the principal objection to the joinder or? That is the principal objection to the joinder. Though I suppose there also is a, you say there was an overlapping concern the other way, that the, that the gun charge would be compromised by the jury learning about alleged witness tampering? Yes. And, but the district judge enjoys a certain amount of discretion. Does the judge not, with respect to there should be joinder or not? The judge does. In this case, our contention is that this was improperly joined, denying the defendant a fair trial. The Kuntz testimony in rebuttal then is objectionable, you say, in which respect? In the respect that it is, we're contending that it's inadmissible evidence in the first place because of a violation of the Fifth Amendment. Because Kuntz was a commissioned agent. In the second place, because it unfair, because of the way it harms the defendant's ability to defend against the gun charge because of the denial of the severance motion. Essentially the way it plays out is it adds additional. And there's some particular part of the content of Kuntz's testimony that's different from information that had come in already? The Kuntz had originally testified that he was essentially the partner in crime that he had previously possessed the firearm in question in the case. And, therefore, he knew about it. That was principally his testimony. And principally his testimony is how he sold the gun to Jesus Cordova. That was his testimony in the government's case in chief. In the case in rebuttal, the government brought in the testimony of Mr. Kuntz in order to ostensibly rebut what Adriana Estrada had said when she testified about Mr. Ivanov. Rebutted in what respect? Well, the government contended that it needed the evidence of testimony of Mr. Kuntz in order to rebut Adriana Estrada's testimony about Jack Ivanov saying that he was upset because Jesse Cordova was taking the blame for something he had done. The government said that what was relevant there was the conversation between Jesus Cordova and Mr. Kuntz about Mr. Cordova allegedly saying that his plan was to try to blame the driver of the vehicle. Jack Ivanov was not the driver. And Edward Larrabee was the driver. So that's how the justification for the rebuttal came in. And the blaming feature is the unfairly prejudicial aspect? No, the way it impairs the ability of the defendant to defend against the firearms charge in relation to have the case has been severed, these issues could have been fully dealt with in terms of how Mr. Kuntz in fact became a commission agent to the government in terms of how his connection with Sergeant Davis took place and all of the other conversations that took place in jail, including the hatching of the scheme that we contend was instigated by Kuntz. And you were precluded from doing that because of the jointer? No, I suppose we could have done it. We could have done it anyway, but effectively it would have had no benefit and it probably would have just helped the client get convicted of both charges. That was my assessment, that we couldn't get into that without aggravating facts to ensure the conviction of the gun case. You know you've got about 35 seconds left. Why don't we let you save that for a rebuttal? Thank you. Good morning, Your Honors. My name is Jonathan Hobb. I was the prosecutor on the case. I'm an assistant United States attorney in Portland, Oregon. I was Mr. Price's opponent then, and if he needs additional time, I'd be glad to donate some to him from my 20 minutes that you've allotted me. The defendant in this case challenges the jury selection, and I wanted to point out an error I made in my brief. I made a mistake regarding the number of challenges that the government used. We both used the maximum allowable peremptory challenges, both for the jury veneer as well as the alternates. We both used all of our peremptories. In my brief I wrote at page 14 the government used all 11 challenges. I should have said all seven challenges. What happened in this case, Your Honors, is that we had this sheet of paper that the clerk presented to us, and we took our challenges, the defendant taking two, and then I took one, the defendant two, and so forth. On the third of the government's challenges, I challenged Jesus Marino. Thereafter, I challenged four and five and six, and the defendant also challenged additional jurors. In defense of Mr. Price and a question of when should he have objected to the challenge of Jesus Marino, the Supreme Court has never told us, nor has this circuit told us, exactly when you're supposed to object to a challenge to a juror. And just looking over the Court's decision and counsel's citation to Contreras-Contreras, I found, I believe, the solution to this case before us today with respect to the limited Batson issue presented by a challenge to a single juror. A single juror. And in 20 years of Batson, there's never been a case I could find where there was a challenge based on a single challenge by a peremptory challenge by a prosecutor or a litigant. In Judge O'Scanlan's case in Contreras-Contreras that the defendant cites, it gives us the solutions in this particular case because it's an unpreserved objection. The defendant did not object, at least at the time when I challenged juror number three. The third juror, he could have stood up and said, Your Honor, I object and have a Batson hearing at that time. In deference to the trial court, it was not, in my opinion, necessary for him to immediately do that, but he waited until after the jury was, the jury veneer was selected and sworn and the others discharged. Had he brought it up earlier, the government was prepared, as we indicated in our record, to withdraw the objection and let that person come on to the jury panel for the reasons stated. In Contreras-Contreras, Judge O'Scanlan wrote, A lawyer may ordinarily act for a defendant and, for example, waive a peremptory challenge of a prospective juror without any showing of a waiver by the defendant. Judge O'Scanlan also wrote, The defendant whose counsel fails to make a timely objection to a peremptory challenge merely forfeits the right to object and may argue on appeal that the peremptory challenge constituted plain error. That supports defense objections today and his challenge today and surprised me, quite frankly, that you could waive an objection, you could allow the jury to be discharged and then raise a Batson objection after the fact and have it considered as plain error on appeal. But that's what our circuit has held. Now we go to whether or not the prosecutor's stated reason was, on a single juror, was facially neutral or rather racially neutral. Well, there's even a prior question, I guess, and that is, was that time of face even to require you to do it? But you did it. So at that point, I guess the judge is required to evaluate what your reason is. Yes, Your Honor. And if this had been a perfect world, I stated the two reasons because I was a prosecutor for paternity cases in my early years in the 80s and 70s. And when I saw people in paternity cases, in those days we convicted them. They were called convicted of being a father. And the only difference between that and a criminal case, you could call them to the witness stand. And so I had a knowledge of paternity cases. I believed he was a paternity defendant, and I don't think he'd appreciate a prosecutor. I also said I didn't have good eye contact with him. And Judge Fletcher, you sat on the panel of the case I just found last night, which was Stubbs v. Gomez, and I showed it to defense counsel this morning, wherein the opinion talks about the prosecutor, in that case, did not have a group-based presumption generally applicable to these kind of cases where there's alleged bias by the prosecutor. In other words, is the prosecutor racially biased, and is he lying about it? That's really what it comes down to in the Batson Challenge. Is the prosecutor racially motivated to keep people of the defendant's race off the jury because of racial animus? And is he giving a legitimate answer when asked by the judge, why did you challenge this juror? In other words, are you lying about it? And in your case where you sat, a personal history was – Did I write the opinion? No, Your Honor, you didn't. Okay. What's the date of Stubbs? I guess I don't recall it. September 1 of 99 was when it was filed, Your Honor. Okay. It was Judge Hall and Judge Thompson. I believe the opinion was written by Judge Thompson. Okay. You sat on the panel. Thank you. But those two things come to collide in the same case here, which is personal history was found in that case not to be race-based, and also the case involving passivity or an attention-ness or an inability to relate to other jurors about somebody who was not making good eye contact. I didn't know about this case. I hadn't researched Batson before, and I didn't know to say, eye contact is a neutral race-based decision. And I didn't know enough to say that a history of a defendant because of prior involvement, what I thought was prior involvement, counsel suggests that it could have been just as a witness, and he's free to argue that. But I think it was – those two decisions and explanations were delivered to Judge Panner. And what he could have done and perhaps should have done was make a final determination and say that third step of Batson, is this a legitimate explanation? Do I accept the prosecutor with his explanation in this case? And the court was free to do that. We were both free to come and say, Judge, we'd like to have you make that decision as a matter of record. But it went past both of us. We just didn't do it. It was not a perfect world. The case was tried in a day and a half. We picked a jury in 90 minutes. We made – beginning at 9.30 on one day until 2.30 in the afternoon, we put witnesses on the stand left and right until we argued for 20 minutes apiece, and I got four minutes in rebuttal. The jury got it on 2.30 the second day, and by 5.30 had a verdict. Now, the defendant in this case did not contend that the witness tampering was defensible, in my opinion. Mr. Howell, before we get away from the Batson thing, maybe this is unimportant, but I thought you described one of the elements of a Batson charge as involving racial animus on the part of the prosecutor. Yes, Your Honor. Is that really right? I mean, of course, if you could demonstrate racial animus on the part of the prosecutor, that would be pretty persuasive. But isn't the real question whether the prosecutor pursues a line which excludes a potential juror because of race, but if you will, without necessarily attributing to the prosecutor personally animus, but just saying, prudentially, I don't want blacks or Hispanics or whites or whatever on this jury. I may like them, but it wouldn't be useful for the purpose of the prosecution. Do you understand that distinction? I believe if the prosecutor – there's two ways we can get in trouble on Batson. One is to challenge all the men or challenge all the women. In those cases, we saw that Sky Chief case where they challenged all the men off so they could have women set on a sexual discrimination case. And we've seen cases where I believe one of the members of this panel had a case where they challenged all the women off. A prosecutor from Montana kicked them all off because – all the men off in a sexual abuse case of a defendant. Wanted all the men off, and all the women were there, and they convicted them. And they said the gender-based bias is just as recognizable under Batson as is racial bias. Now, I'm not – In those cases. And I believe if you could show that I picked that juror and Mr. Moreno off because he was of the same race as the defendant and because of his race would more necessarily acquit the defendant, that would be wrong and unconstitutional and reversible error. I believe that's what the holdings are of Batson. Now, the issue of race is a slippery one because Hispanic – my first assistant reminded me yesterday – Moreno could have been a Castilian Spaniard in the United States. He could have been a Portuguese speaker who lived in Angola or Mozambique or Brazil. It doesn't help us to talk about languages like I did in my brief. I said I thought he was a Spanish speaker because I heard an accent. I believe Mr. Moreno was of the same ethnic background of the defendant in this case. That was called in our precense white Hispanic. And Hispanic is something our Census Bureau uses probably to the consternation of people who would otherwise call themselves Latino or Latina or Chicano. But we call that Hispanic. And the Ninth Circuit has held that's a recognizable distinction for Batson purposes. And I came across the case just this morning – I think it was Huffman – which cites Ninth Circuit approval that recognizable group Hispanic. So that's what we have in the Ninth Circuit. I think it's properly before you and that the judge properly could have considered it. And that you can now consider that even though it wasn't done in perhaps the most precise and timely manner, that it was racially neutral and that it was not an evidence of purposeful discrimination. As I said, no other case has held that a single challenge has been sufficient. Usually it's two and three or four or all the men or all the blacks or all the whatever. I don't want to waste your time because I know you want to get on to other issues. I was just drawing a distinction, which may not be a useful one, between the question whether the action of exercising the peremptory challenge reflects a determination. I don't want a person of that gender or that ethnic persuasion on my jury. But that's a prosecutorial judgment that doesn't necessarily have to reflect an inner prejudice by the prosecutor himself or herself. I'll leave it at that because I don't think it's pertinent to the issues before us. I think you're already pointing out that these peremptory challenges are important to both parties. The court has always held both parties get the usual. Absolutely. And if you don't, it's automatic reversal. Also that they're primarily instinct-driven and intuition of the parties. We can't always point to specifics. It's kind of a feeling we have that in my case, I said I kind of wanted this juror there because he spoke Spanish. And I think he'd figure out Jesse Cordova was trying to speak Spanish to avoid being detected and that he would have been good for the jury. But on balance, I said I believe because of the paternity issue, he's not going to like me. And so I kicked the juror off. And in balance, I wished I wouldn't have. I wish we could have had him back on the jury because I think the case was overwhelming. Overwhelming in the sense this defendant from the very beginning possessed a firearm repeatedly as testified to by several defendants. He was found on the day of his arrest. And in the excerpt of the record, I have this picture produced for you. I believe it's a government's Exhibit 37. I'll have it in just a moment. This is the defendant moments before his arrest wearing a red sweater, buying beer in a store in Wilsonville, Oregon. Now, this sweater ended up in the backseat of the car with a pistol inside. Now, Jesse Cordova had originally denied to have this sweater. That was one of the issues. But he had this gun that's shown here, government's 19. And this gun had the handle that you see here with the marble or pearl handle. When you said he had this gun, when? Good point, Your Honor. He had it. He didn't have it when the police came. And as he indicated, I didn't have the gun. It was in the car. He never got found with this gun on his person. It was a circumstantial evidence case that the gun – Oh, I see. So when you say he had this gun, you're telling me that you agree with the decision of the jury. I do, Your Honor, because our first witness said – So you're not talking about uncontested he had the gun. You're saying we won. We won because of circumstantial evidence and the defendant's contention to his colleagues and to the – What do you make of the rebuttal argument for Mr. Coon's testimony? Your Honor, it was confusing to me to try to deal with the statements that were permitted by the court. The defense lost below when the issue of – the Messiah issue or the Miranda issue, Judge Panner held statements made in the county jail to the defendant's friend, Richard Parks Coons, was – those statements were admissible. And what the jury didn't get to hear that I had a chance to produce for them was the defendant and he talked about that's the gun we both owned at one time. That's the gun that Bonnie gave Clyde. He knew about that gun, and the defendant told him about how he got caught with it and that he had gone in and he asked Jack to hold his strap, and when he came back he thought a woman saw him in the parking lot, so he put it in the red sweater, and the police caught him with it. None of those statements came to the court. The rebuttal testimony, I believe. None of those statements, Your Honor, were theirs. That's what we didn't hear, and that's what I could have offered but didn't. Now what we did offer was at that same jail, Coons was asked only three questions in rebuttal. He was asked three questions. Did you speak with the defendant regarding the person responsible for the charges of felon possession of firearm? Yes, sir. What did he say regarding liability? Who was guilty? He asked the question. Whoever possessed it? Yeah. What did he have to say about that? That it wasn't on his person, that it wasn't an automobile, somebody else's automobile, and possession is nine-tenths of the law. Did he tell you in the county jail what his intention was regarding blaming somebody? And what does this rebut? Did he ever tell you – asked the question, did he ever tell you Jack Ivanoff was the person responsible? Answer, I don't believe so. Are you sure? Yes. It proves, Your Honor, that Jack Ivanoff, his good friend, the Russian-speaking Jack Ivanoff, his companion, was not viewed by him, Jesse Cordova, in jail as being responsible for that gun. What was that rebuttal? Because the defendant, in his testimony of Adriana Estrada, injected a black gun into the mix, a black gun without a clip. And she took the stand to say Jack Ivanoff was at a place at JoJo's with me, and he had a black gun, and he was careful not to put his prints on it, and the evidence was it had no clip in it. And that black gun was something Jack said, I'm paraphrasing here, I'm sorry, Jesse's in trouble for what I did. I'm the one who possessed the gun. He's the one who shouldn't be on trial. It's my fault. I, Jack Ivanoff, am guilty, and I feel bad for my friend, Jesse Cordova. That's the evidence they injected with Adriana Estrada's testimony. To rebut her testimony that it was a black gun, I sought to take the agent's gun from him, put it in front of that witness, and ask her, Is this the gun? A totally black gun, not a pearl-handed gun. Thinking that the defendant, when he did possess a firearm, we believe, he possessed a gun just like that, a black gun, a day before, at the same residence, when he was threatening another man, Steve Kenney. I wanted to prove that. I wanted to prove that Jack Kenney saw the defendant with a black gun and a clip in his pants. I'm still having difficulty understanding what Kuntz's rebuttal testimony relates to in that aspect. Your Honor, Kenney was a witness, Steve Kenney. I must have misspoke. Steve Kenney was not permitted to testify. On the day before this arrest, he was in Wilsonville at the same place where the defendant was, and the defendant had a black gun with a black clip, not a white pearl-handled gun at all. He had a gun the day before, and what I was trying to get Estrada, what I wanted to prove was she's lying. This is not the right day. Jack Ivanoff didn't have a black gun. The black gun that they had together didn't have a clip in it, and she's making this all up in order to try and cover for Jesse Cordova, her friend. So I offered rebuttal testimony that I didn't get to put in, was that Jesse Cordova, the day before, had a black gun. That didn't come in. But I was able to ask her about the firearm that she had and present her with these other two guns to see if she would rise to the bait and say, yeah, that's the black gun he had. Well, she didn't do that. So this was cross-examination in an effort to prove that she was lying, committing perjury. And my rebuttal was merely to direct an attack against her when she said,  he told me it was his fault that he got in trouble, that he should have been in trouble for that black gun. And what I was trying to show is there's more than one gun around here. There's a gun that Jack had at one time when he momentarily handled it that didn't have a clip in it. There's another black gun that Jesse Cordova had the day before at the same place that she could have been confusing. In other words, she could have had the date wrong. I'm entitled to prove that and challenge her, and that's why I offered that rebuttal, Your Honor. I've got one minute left, and I'd be glad to give that to Mr. Price so he can respond appropriately, unless you have any other questions for me, Your Honors. Fifty-three seconds plus 37. Go for it. Thank you, Your Honors. Thank you, Mr. Hobbs. I'd just like to clarify that this particular gun, as indicated in the brief, was described by two of the government's witnesses as a black gun, a police officer and also Mr. Ivanoff. They described it, Ivanoff said it was a black nine. So the evidence we contended was irrelevant. It shouldn't be coming in. We hadn't introduced the concept of a black gun. In fact, the government's witnesses had discussed it and described it in some context as a black gun. Okay. Thank you very much for your argument. The case of the United States v. Arguments, case of the United States v. Cordova is now submitted for decision.
judges: Noonan, W. Fletcher, Pollak